UNITED STATES DISTRICT COURT   ~~JUDGE SWEET~~   ~~FILE COPY~~
~~SOUTHERN DISTRICT OF NEW YORK~~

-------------------------------------------------------------X

M.M. on behalf of Y.M.,                       **14 CV** Case N**o. 2306**

       Plaintiff,

       v.                                        <u>COMPLAINT</u>

New York City Department of Education and
CARMEN FARIÑA, in her official capacity as Chancellor
of the New York City School District,



       Defendants.

-------------------------------------------------------------X

## <u>PRELIMINARY STATEMENT</u>

    1)    The New York City Department of Education and Carmen Fariña, Chancellor of

the New York City School District (collectively, the "Defendants"), are required to provide a

free appropriate public education to all children with disabilities who reside in New York City.

20 U.S.C. § 1400, et seq.; N.Y. Educ. Law §§ 4401, , 4402, 4404, 4410; 8 N.Y.C.R.R. § 200.

Specifically, a free appropriate public education is an education that is provided at public

expense, that meets the standards of the state education agency, and that is provided in

conformity with the Individualized Education Program developed for the student.  (20 U.S.C. §

1401(9).)  Where Defendants fail in their obligations to provide a free appropriate public

education, parents may enroll a child in a private school and seek tuition payment from the

school district. *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006).

    2)    In determining whether the school district is obligated to pay a student's tuition to

receive an appropriate education at a private school, the Supreme Court established a three-

pronged test: (1) were the student's educational program and/or placement inappropriate; (2) was

the private placement in which the parent unilaterally placed the student appropriate to the

student's needs; and (3) do the equitable considerations favor granting the relief. *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370-74 (1985). If the answer to all three questions is yes, then the school district must pay the student's tuition at the private school.

3)    Y.M. is a 17-year-old[1] New York City resident classified with Intellectual Disability by Defendants.   Y.M. has significant academic deficits across the curriculum, including delays in reading, writing, speaking, and math.   She also suffers from conductive hearing loss.

4)    Defendants failed to provide Y.M. her federally- and state-mandated free appropriate public education for the 2012-2013 school year ("2012-2013 School Year"). Defendants failed to offer a free appropriate public education because: (a) Y.M.'s Individualized Education Program for the 2012-2013 School Year ("IEP") was not individualized to meet her needs; (b) the public school placement offered by Defendants was not appropriate to meet Y.M.'s needs; and (c) the public school placement offered could not implement the requirements of Y.M.'s IEP.

5)    To remedy the deprivation of Y.M.'s guaranteed right to a free appropriate public education, and to ensure that Y.M. received an appropriate education, Plaintiff M.M., Y.M.'s mother, (the "Mother") placed Y.M. at the Cooke Center Academy ("Cooke"), a private school, for the 2012-2013 School Year and filed a due process complaint against Defendants seeking direct tuition payment to Cooke for the 2012-2013 school year.

6)    In the Findings of Fact and Final Decision of Hearing Officer Jeanne Keefe, Esq. (the "Hearing Officer Decision") dated September 6, 2013, the Hearing Officer correctly found that Defendants deprived Y.M. of a free appropriate public education for the 2012-2013 School Year because Defendants did not create a procedurally and substantively sound IEP and did not

---

[1] Y.M. was 16 years old during the 2012-2013 school year.

offer Y.M. an appropriate public school placement. (Attached hereto as Exhibit "A" is a copy of the Findings of Fact and Decision of Hearing Officer Jeanne Keefe, Esq. dated September 6, 2013, at pp. 7-9.)[2] The Hearing Officer correctly found that Cooke was an appropriate placement to address Y.M.'s educational needs and that the equitable considerations favored ordering Defendants to pay for Y.M.'s tuition at Cooke. (*Id.* at pp. 8-10.)

7)   Defendants appealed the from the Hearing Officer's Decision to the New York State Review Officer. Defendants only appealed the branches of the Hearing Officer's Decision that found that they did not offer Y.M. a free appropriate public education and that the equities favored ordering the Defendants to pay for the cost of Y.M. to attend Cooke for the 2012-2013 school year. Defendants did not appeal the branch of the Hearing Officer's Decision that found that Cooke was appropriate to meet Y.M.'s needs.

8)   In a Decision dated December 5, 2013 (the "State Review Officer Decision"), the State Review Officer sustained Defendants' appeal, incorrectly finding that Defendants had provided a free appropriate public education to Y.M. (Attached hereto as Exhibit B is a copy of the Decision of the State Review Officer dated December 5, 2013 at p. 20.) The State Review Officer did not address the Hearing Officer's decision that the equitable considerations favored granting Y.M.'s Mother the relief she sought of tuition payment for Cooke. (*Id.* at 20.)

9)   Y.M.'s Mother brings this action to require Defendants to pay the cost of providing Y.M. a free appropriate public education for the 2012-2013 School Year.

## JURISDICTION

10)   This Court has jurisdiction under 28 U.S.C. § 1331, in that claims are asserted under the laws of the United States, under 28 U.S.C. § 1343(a), in that claims are asserted under

---

[2] Pursuant to section 1417(c) of the Individuals with Disabilities Education Act and section 1232g of the Family Educational and Privacy Rights Act, Exhibit A has been redacted as to the names of Y.M. and M.M. to protect their privacy. *See* 20 U.S.C. § 1417(c),  20 U.S.C. § 1232g.

laws providing for the protection of civil rights, and under 20 U.S.C. § 1415(i)(2) & (3) and 29 U.S.C. § 794(a). This Court has supplemental jurisdiction over all state law claims herein asserted pursuant to 28 U.S.C. § 1367, as such state law claims form part of the same case or controversy as the claims for which this Court has original jurisdiction.

11)    Venue is proper under 28 U.S.C. § 1391(b).

12)    If successful, Plaintiffs are entitled to costs and attorneys fees under 20 U.S.C. § 1415(i)(3) and 29 U.S.C. § 794a(a)(2).

## PARTIES

13)    Plaintiff M.M. is the mother of Y.M., a child with a disability who resides in New York County.

14)    Y.M. is a 17-year-old New York City student whom Defendants classified with an Intellectual Disability. Y.M. has significant communication, processing, and academic delays.

15)    Upon information and belief, Defendant New York City Department of Education is the official body charged with the responsibility for developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities. (N.Y. Educ. Law §§ 2590, 2590-g [McKinney 2009].) The New York City Department of Education is a recipient of federal assistance. The New York City Department of Education is a branch of municipal government in New York City with its principal place of business located at 52 Chambers Street, New York, New York, 10007.

16)    Defendant Carmen Fariña is the Chancellor of the New York City Department of Education and as such is entrusted with the specific powers and duties set forth in New York

Education Law § 2590-h (McKinney 2010). The Chancellor's principal place of business is located at 52 Chambers Street, New York, New York, 10007.

## OVERVIEW OF APPLICABLE FEDERAL LAW

17)     Congress enacted the Individuals with Disabilities Education Improvement Act ("IDEA") to ensure that students with disabilities are provided with meaningful access to public education. States who participate in the IDEA receive substantial federal funds in exchange for their agreement to provide a free appropriate public education to all disabled children in the state, and to comply with the IDEA's procedural and substantive mandates.

18)     New York has chosen to participate in the IDEA framework, and has established procedures for providing special educational services to children with disabilities. N.Y. Educ. Law § 4401 et seq.

19)     The primary mechanism for insuring implementation of the IDEA's mandate of a free appropriate public education is the Individualized Education Program ("IEP"). An IEP is a document prepared by a multi-disciplinary team, prepared for every child with a disability, which is required to describe the child's present levels of performance and provides a roadmap for the child's educational program. The IEP must set forth the special education and related services, supplementary aids and services, health needs and services, and program modifications or supports for school personnel that the student's school must provide to enable that child to achieve a comprehensive set of annual goals and short-term objectives.

20)     The IDEA requires Defendants to not only prepare an appropriate IEP, but also to offer the student a school placement that can implement the IEP.

21)    The IDEA requires that school districts provide a free appropriate public education, which is an education that has been provided at public expense, meets the standards of the state education agency, and is provided in conformity with the IEP.  (20 U.S.C. § 1401(9).)

22)    When a school district has not provided a free appropriate public education, the school district may be required to pay for the student's private placement when the private placement is appropriate to meet the student's needs and the equities favor granting the relief of payment for the student's private school tuition.  (*See* 20 U.S.C. § 1412(a)(10)(C)(ii); 20 U.S.C. § 1415(i)(2)(C)(iii).)

23)    Further, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." (29 U.S.C. § 794(a).)   Section 504 expressly requires that schools provide a free appropriate public education to students with disabilities.  34 C.F.R. § 104.33.  As a recipient of federal funds, the DOE must comply with the requirements and prohibitions against discrimination set forth in Section 504 of the Rehabilitation Act.

24)    Y.M. qualifies as a person with a disability under Section 504.

## FACTUAL ALLEGATIONS

### Y.M.'s Educational Background

25)    Y.M. is a 17-year-old New York City student whom Defendants have classified with an Intellectual Disability.

26)    Due to cognitive delays, Y.M. functions significantly below grade level and experiences major academic deficits across the curriculum, including in math, reading, and

writing. She has difficulty with expressive and written communication, and needs speech and language services to remediate her lack of phonemic awareness, speech intelligibility, and articulation. She also has conductive hearing loss.

27)   Y.M. requires numerous supports to make academic progress, including scaffolding, manipulatives, multi-sensory techniques, graphic organizers, checklists, prompting, repetition, and small group instruction. She also requires instruction in adaptive daily living skills, such as community-based inclusion, household chores, and travel training.

**Defendants Failed to Provide Y.M. a Free Appropriate Public Education**
**For the 2012-2013 School Year.**

28)   The Defendants' Committee on Special Education convened a meeting on June 5, 2012 to develop an IEP for Y.M. (the "IEP Meeting") for the 2012-2013 School Year. At the time of the meeting, Y.M. was 15 years old, turning 16 years old during the 2012-2013 School Year.

29)   Prior to the IEP Meeting, the Defendants' Committee on Special Education did not have sufficient evaluative information to determine an appropriate educational program for Y.M. For example, the Defendants' Committee on Special Education did not conduct an audiological exam to determine whether her conductive hearing loss affected her educational performance.

30)   The IEP Meeting was attended by the Mother, Aminah Lucio as district representative and school psychologist, a parent member, a special education teacher, a related service provider/special education teacher, Jillian Chaiken (Y.M.'s then-teacher at Cooke), and Sally Ord (Cooke's consulting teacher).

31)   At the IEP Meeting, the Committee on Special Education classified Y.M. as a student with an Intellectual Disability and recommended, *inter alia*, that Y.M. attend a special

class with 12 students, one teacher, and one paraprofessional in a special school ("12:1:1") for the 12-month school year, commencing in July of 2012, with related services. Objections were made at the IEP Meeting to the recommendation that Y.M. be educated in a class with 12 students and one teacher, because Y.M. needs a smaller student-to-teacher ratio in order to make educational progress. But the Defendants' Committee on Special Education made its recommendation over all objections.

32)   The Mother was not provided with a copy of Y.M.'s IEP at the IEP Meeting.

33)   The Mother eventually received Y.M.'s IEP. Y.M.'s written IEP was not individualized to Y.M.'s educational needs and was replete with errors, incomplete, and missing critical information for its implementation.

34)   In particular, on *over 70* separate occasions, the IEP referred not to Y.M. but to Y.M.'s sister. While Y.M.'s sister also receives special education services, the sister has educational and social-emotional needs that differ from those of Y.M. Y.M.'s IEP detailed needs and educational goals that were not applicable to Y.M., but rather, to her sister. For example, Y.M.'s IEP contains a goal in the area of learning about budgets that, while possible for her sister (who functions at a higher math level than does Y.M.), was wholly inappropriate for Y.M., whose lower math skills would not permit her to achieve this goal.

35)   The section of Y.M.'s IEP dedicated to annual goals and short-term objectives, as well as the section dedicated to transition activities, also contains a variety of errors ranging from use of the wrong name to the absence of information crucial to the IEP's implementation. For example, while Y.M.'s IEP mandates a "Coordinated Set of Transition Activities" such as adaptive daily living skills and travel training, the section that is supposed to denote the School District or Agency responsible for such activities is entirely blank. Thus, the IEP fails to identify

how those services will be provided. And Y.M.'s short-term objective for travel training not only mistakenly refers to her sister by name, it also contains an incomplete sentence with missing information. Other errors include an accuracy percentage missing from an annual goal and references to incorrect gender pronouns "he" and "his" throughout the document, making clear that portions of Y.M.'s IEP were not customized to Y.M.'s individualized needs.

36)    All of these errors in the IEP prevent a proper understanding of Y.M.'s long- and short-term objectives and transitional activities, and prevent proper implementation of her IEP.

37)    Moreover, the recommended program of a classroom with a 12:1:1 staffing ratio is inappropriate for Y.M. Y.M. requires more teacher and small group support to progress than a classroom with one teacher for 12 students can provide. Further, the IEP recommends a classroom with a 12:1:1 staffing ratio  across all class subjects, with no individualization for math, the area in which Y.M. has the most academic difficulty. Indeed, Defendants' Committee on Special Education ignored information from Cooke that Y.M.'s math class at Cooke is comprised of nine students and two teachers because Y.M. requires a very small student-to-teacher ratio to make progress in math.

38)    Defendants did not recommend a specific school for Y.M. at the IEP meeting, nor did Defendants recommend a specific school for Y.M by June 15, 2012. However, Defendants' own website provides that: when an IEP recommends a student be educated in a special class setting for a 12-month school year, the parents should receive an offer of placement by June 15, 2012.[3]

39)    Defendants eventually issued a "Final Notice of Recommendation," dated June 27, 2012, recommending that Y.M. attend public school P079M @ Horan School (the "Horan School").

---

[3] *See* http://schools.nyc.gov/Academics/SpecialEducation/SEP/determination/timeline.htm.

40)     Once the Mother at last received the Final Notice of Recommendation, she tried to contact Horan School on multiple occasions to obtain information and schedule an appointment to visit the school.  However, her telephone calls were only ever answered by an answering machine message in English, which she does not understand.  Consequently, she did not have the opportunity to visit Horan School until October of 2012, only after having reached out to an employee of Cooke for assistance in making the appointment.

41)     On August 24, 2012, 10 business days prior to the beginning of the September 2012–June 2013 portion of the school year, the Mother, by her attorneys, provided Defendants with notice that the Mother would be unilaterally placing Y.M. at Cooke and seeking direct tuition payment.  Defendants failed to respond to the notice in any way.

42)     The Cooke enrollment contract stated that if the Mother chose to place Y.M. in a public school placement offered by Defendants prior to October 31, 2012, she would be released from the contract.  The tuition for Cooke for the September 2012–June 2013 portion of the school year was $48,500.  The Mother could not afford to pay for Cooke's tuition up front.

43)     The Mother visited the school on October 12, 2012.  The parent coordinator at the Horan School (i.e., the person identified as being able to give information about the available programs and providing opportunities to observe appropriate classes), Ms. Ortega, conducted the tour and was able to speak with the Mother in Spanish.

44)     During the tour, Ms. Ortega indicated that, based on Y.M.'s age and the recommendation on her IEP that she be placed in a classroom with a 12:1:1 staffing ratio, Y.M. would be placed in one of three classrooms at the Horan School.  However, the three classrooms were inappropriate for Y.M. as they each contained students with an inappropriate range of functional levels, and some of the classrooms contained students with severe emotional and

10

behavioral issues. Y.M. does not have behavioral issues. Moreover, due to her hearing loss, as reflected on her IEP, she needs seating away from extraneous noise, which would be difficult to accommodate in a class with students with behavioral issues.

45)     Further, the students in the three classrooms had educational levels ranging from kindergarten through fourth grade. New York Regulations require that classes be composed of students with similar academic levels and learning characteristics. 8 NYCRR § 200.6(h). Thus, the classes in which Y.M. would have been placed violated New York Regulations and varied too greatly to be appropriate for Y.M.

46)     The Horan School did not utilize any of the teaching methodologies and supports that Y.M. needed and were required by her IEP, such as scaffolding, multi-sensory techniques, checklists, manipulatives, graphic organizers, and small group instruction. In addition, while Y.M.'s IEP mandates a Coordinated Set of Transition Activities such as adaptive daily living skills and travel training, the Horan School did not provide travel training. Instead, the Horan School relied upon Defendants' District 75 office to provide travel training, but there was an up-to-two-year waiting list for such training, with priority going to older students who were graduating and currently working at work sites. Similarly, the only specific adaptive daily living skills facility on Horan School's campus was a culinary arts room for older students that was not available to Y.M. As a result, transition activities that Y.M.'s IEP mandated, such as travel training and adaptive living skills training, were not available at the Horan School for Y.M. during the 2012-2013 school year.

47)     There was also no consistent community inclusion program at Horan School. Instead, such programs were implemented at the discretion of classroom teachers. The Horan School could not confirm that the community-oriented annual and short-term goals and

11

Transition Activities in Y.M.'s IEP would be implemented, such as using a public library, using money in the community, reading community signs and instructions, using mass transit and banking facilities, and identifying organizations and agencies in her community that provide leisure activities.

48)   Because the Horan School could neither meet Y.M.'s needs nor even implement her IEP, Horan was an inappropriate placement for Y.M., and Y.M. remained at Cooke.

**Cooke Was an Appropriate Placement for Y.M.**

49)   Cooke is a special education private high school located at 60 MacDougal Street in Manhattan, New York.   Through specially designed small classes and integrated related services, Cooke provided a program for Y.M. during the 2012-2013 school year that was specifically tailored to meet her cognitive, social, and therapeutic needs.   Cooke's Access to Independence program provided ELA and math instruction to Y.M. with the kinds of supports, methodologies and individualized attention that she needs.   Cooke also provided Y.M. with courses focused on obtaining transition skills, such as travel training, self-advocacy, and adaptive daily living skills, which assist her in successfully transitioning to post-school life.   Additionally, the school utilizes a "Daily Living Lab," and has group therapy spaces, a technology center, and large spaces for student dining and social activities, all of which contribute to the academic, vocational, and social progress that Y.M. requires.   With the benefit of Cooke's appropriate programs and services, Y.M. has experienced dramatic academic and social-emotional progress.

**The Mother Cooperated Fully with Defendants.**

50)   The Mother cooperated fully with the school district throughout the process.   The Mother participated fully in IEP meetings with the Committee on Special Education, visited and

considered the Defendants' recommended public school placement, and timely informed the Defendants that she was placing Y.M. at Cooke.

**The Mother Files an Impartial Hearing Requesting an Order that Defendants Pay Tuition for Cooke for the 2012-2013 School Year.**

51)    On April 1, 2013, the Mother filed a due process complaint.

52)    In the due process complaint, the Mother set forth that Defendants had failed to provide a free appropriate public education and discriminated against Y.M. on the basis of her disability.    In particular, the Mother alleged that there were procedural and substantive deficiencies in Y.M.'s IEP for the 2012-2013 School Year, including the facts that: (1) the IEP failed to contain individualized information about Y.M. sufficient to address her unique educational and emotional needs; and (2) the IEP was sloppy, incomplete, and included information about other students with needs and goals different from those of Y.M. Additionally, the due process complaint alleged that the DOE failed to conduct mandated testing to determine Y.M.'s audiological defects, as well as testing to track her progress and establish individual programmatic goals.

53)    The due process complaint also set forth that the Horan School was inappropriate to meet Y.M.'s individual social and academic needs because, among other issues: (1) the classrooms exceeded the permissible functional grouping ratio; (2) the school failed to implement a scaffolding or "fading teacher" model, as mandated by Y.M.'s IEP; (3) the school could not offer Y.M. the programs she needed to transition post-school, as set forth in her IEP; and (4) the school had neither the adaptive daily living skills nor the community inclusion programs that Y.M. required, as set forth in her IEP.

54)    An Impartial Hearing was convened and lasted for five nonconsecutive days, from May 3, 2013 to July 29, 2013.

13

55) Defendants had the burden of proof to show that they offered Y.M. a free appropriate public education, including a substantively appropriate IEP and a public school placement that could meet Y.M.'s needs and implement her IEP. However, Defendants did not offer *any* evidence that the Horan School could meet Y.M.'s needs or implement her IEP.

56) On September 6, 2013, the Hearing Officer issued a Findings of Fact and Decision ("Hearing Officer Decision").

57) In the Hearing Officer Decision, the Hearing Officer correctly found that Defendants deprived Y.M. of a free appropriate public education for the 2012-2013 School Year because they failed to: (1) create a procedurally and substantively sound IEP, and (2) offer Y.M. an appropriate placement. (*See* Exh. A, at p. 8-9.)

58) The Hearing Officer correctly found that Y.M.'s IEP was not individualized, that numerous procedural errors in the IEP cumulatively rose to a level of deprivation of a free appropriate public education. The Hearing Officer also noted that it was Defendants' responsibility to present evidence that they offered Y.M. an appropriate public school placement that could implement Y.M.'s IEP, but that Defendants failed to present any evidence that the Horan School was appropriate and could implement Y.M.'s IEP. (*Id.*, at pp.8-9.) The Hearing Officer correctly found that, as a result, Defendants failed to offer Y.M. an appropriate public school placement, which constituted a denial of a free appropriate public education. (*Id.*)

59) The Hearing Officer held further that Cooke was an appropriate placement to meet Y.M.'s unique educational needs, and that the equitable considerations supported the Mother's claims. (*Id.*, at pp.9-10.) The Hearing Officer then ordered Defendants to pay for Y.M.'s tuition at Cooke and special education transportation for the 2012-2013 school year. (*Id.* at pp. 8-10.)

14

60)     Defendants appealed from the Hearing Officer's Decision to the New York State Review Officer ("State Review Officer"). Defendants only appealed the branches of the Hearing Officer's Decision that found that they did not offer Y.M. a free appropriate public education and that the equities favored ordering the Defendants to pay for the cost of Y.M. to attend Cooke for the 2012-2013 school year.

61)     Defendants did not appeal the branch of the Hearing Officer's Decision that found that Cooke was an appropriate placement for Y.M. Thus, it is the law of the case that Cooke was an appropriate placement for Y.M. for the 2012-2013 School Year.

62)     In a Decision dated December 5, 2013 (the "State Review Officer Decision"), the State Review Officer sustained the appeal and incorrectly found that Defendants had provided a free appropriate public education to Y.M for the 2012-2013 School Year. (*See* Exh. B., at p. 20.)

63)     In so doing, the State Review Officer erroneously determined that the law does not require Defendants to offer evidence that they offered Y.M. a public school placement that was appropriate for Y.M. and could implement her IEP.

64)     The State Review Officer also erred in failing to consider the evidence presented by the Mother that, at the time the Mother decided not to enroll Y.M. in the Horan School, she did so because she had learned facts that the Horan School was not appropriate for Y.M. and could not implement her IEP.

65)     Further, the State Review Officer's poorly-reasoned decision ignored substantial evidence submitted by the Mother and corroborated testimony clearly demonstrating that the IEP was insufficient to address Y.M.'s academic and social needs.

66)    The State Review Officer also erred in his failure to defer to the credibility determinations made by the Hearing Officer, the person in the best position to evaluate the candor and demeanor of the witnesses.

67)    Having found that Defendants offered Y.M. a free appropriate public education, the State Review Officer did not rule on whether the equities favored the relief sought by the Mother.

## CAUSES OF ACTION

### Count I

### (Failure to Offer a Free Appropriate Public Education)

68)    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

69)    Defendants' failure to offer Plaintiffs an appropriate educational program or placement deprived them of their right to a free appropriate public education under IDEA, 20 U.S.C. § 1400, et seq. and the regulations promulgated thereunder.

70)    The State Review Officer erred in reversing the Impartial Hearing Officer's Decision that Defendants denied Y.M. a free appropriate public education. As set forth above, Defendants failed to provide an IEP and placement appropriate to address Y.M.'s individualized education needs.

71)    The State Review Officer erred in holding that Defendants were not required to prove that the Horan School was appropriate for Y.M. and could implement her IEP.

72)    The State Review Officer also erred in failing to consider the evidence presented by the Mother that, at the time the Mother decided not to enroll Y.M. in the Horan School, she

did so because she had learned facts that the Horan School was not appropriate for Y.M. and could not implement her IEP.

**Count II**

**<u>(Violation of Section 504 of the Rehabilitation Act)</u>**

73)     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

74)     Section 504 provides, in pertinent part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."  29 U.S.C. § 794(a). Section 504 expressly requires that schools provide a free appropriate public education to students with disabilities.  34 C.F.R. § 104.33.  As a recipient of federal funds, the DOE must comply with the requirements and prohibitions against discrimination set forth in Section 504 of the Rehabilitation Act.

75)     Y.M. is a qualified individual with a disability under Section 504.

76)     The DOE failed to accommodate Y.M.'s disability by offering a school placement that could not implement her June 2012 IEP.  In particular, the DOE failed to recommend an individualized and appropriate IEP and to provide a placement that offered the academic supports, methodologies, and transitional services mandated by Y.M.'s IEP.

77)     Defendants' repeated listing throughout Y.M.'s IEP of her sister's academic needs, rather than those of Y.M., Defendants' mention of a male student's IEP mandates in Y.M.'s IEP, and Defendants' failure to complete portions of the IEP demonstrate a reckless disregard for Y.M.'s special education needs.

17

78)     The Mother presented evidence at the hearing that, at the time the Mother decided not to enroll Y.M. in the Horan School, she did so because she had learned facts that the Horan School was not appropriate for Y.M. and could not implement her IEP.

79)     By failing to provide Y.M. with an appropriate IEP, program and placement and free appropriate public education to Y.M. for the 2012-2013 school year, Defendants violated Section 504.

80)     Plaintiffs are entitled to recover from Defendants the reasonable attorneys' fees and costs incurred in bringing this action.

**Count III**

**(Violation of the New York State Education Law)**

81)     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

82)     By failing to provide Y.M. with a free and appropriate public education, Defendants have violated the rights of the Plaintiffs under New York State Education Law §§4401, 4402, 4404 and 4410 and Part 200 of the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. § 200.

**RELIEF**

WHEREFORE, Plaintiffs respectfully Request the Court Issue a Judgment that:

   a) Defendants failed to provide a free and appropriate public education in violation the Plaintiffs' rights under the IDEA and New York Education Law;

   b) Defendants unlawfully discriminated against Y.M. under Section 504 by excluding her from her right to receive free and appropriate public education for the 2012-2013 school year and failing to accommodate her disabilities;

18

c) the equitable considerations favor ordering the Defendants to pay for the cost of Y.M. to attend Cooke for the 2012-2013 school year, which totaled $48,500, as well as special education transportation;

d) Defendants be ordered to pay for the cost of Y.M. to attend Cooke for the 2012-2013 school year, which totaled $48,500, as well as special education transportation;

e) Plaintiffs be awarded their costs and attorneys' fees; and

f) such other and further relief as may be appropriate be granted.

Dated: April 2, 2014
      New York, New York

Respectfully submitted,

Caroline J. Heller (CH-8814)
*Greenberg Traurig, LLP*
The MetLife Building
200 Park Ave.
New York, New York
(212) 801-9200
*Attorneys for Plaintiffs*

19